Ranney, J.
We can not consider it necessary to enter at much length upon an examination of the power of the courts of this state to order a peremptory nonsuit. If any question can be said ■to be settled, this must be so regarded. There is reason to believe that the power has been constantly exercised since the first organization of the state government; and it is certain that, since 1813r the power has been expressly and repeatedly recognized by the legislature. From- that time to this, by numerous statutory provisions, the party against whom such a judgment has been given has been secured in the right to appeal, or to except to the order of the court, and to review it on error.
In the multitude of cases that have in this manner found their way to the Supreme Court, no doubt has been expressed, either from the bench or at the bar, of the existence of the power, although the propriety of its exercise, in particular cases, has often been obstinately contested. It is true that these enactments have not, in terms conferred the power; but they furnish unmistakable evidence :that the legislature was well advised of the course of decision *645, 646 tbe subject, and intended it to continue with tbe proper safeguards, against abuse. In view of .this Uninterrupted practice of courts, sanctioned and regulated by the legislative department for' half a century, it can matter but little what may have been the course of decision in other states, or in the federal courts. If there is anything eminently and exclusively our own, it is our system of legal procedure; and while an enlightened policy would require us to consult other systems when constructing one for ourselves, they ought never to be received to prevent the application of rules and principles which we have deliberately adopted and applied for such a length of time as to give them general notoriety. If it was necessary, however, it would not be difficult to show that our decisions-have rather limited than extended the power exercised by the courts-of such of the old states as were, for obvious reasons, most influential in giving character to our system of law and legal procedure-And if we have somewhat enlarged the practice of ordering involuntary nonsuits, as compared with the English courts and those of other states of the Union, it has been done, as a matter of practical convenience, by substituting this mode of proceeding for the demurrer to evidence, in full operation with them, thereby referring1 the rights of the parties to the same principles of adjudication and attaining the same end, but in a manner much less embarrassed with technical formality, and in its effect much more favorable to-the plaintiff, against whom the power is exercised.
There is still less difficulty in defending the exercise of this power-from the imputation of being an encroachment upon the constitutional right of trial by jury. The law of every case, in whatever1 form presented,belongs to the court; and it is not only the right of the judge, but his solemn duty, to decide and apply it. He must determine the legal requisites to the right of action, and the admissibility of the evidence offered to sustain it. When all the evidence-offered by the plaintiff has been given, and a motion for a nonsuit is interposed, a question of law is presented, whether the evidence before the jury tends to prove all the facts involved in the right of action and put in issue by the pleadings. *In deciding this question, no finding of facts by the court is required, and no weighing of the evidence is permitted. All that the evidence in any degree tends to prove, must be received as fully proved; every fact that the evidence, and all reasonable inferences from it, conduces to> establish, must be taken as fully established.
*647 The motion involves not only an admission of the truth of the ■evidence, but the existence of all the facts which the evidence con- • duces to prove. It thus concedes to. the plaintiff everything that the jury could possibly find* in his favor, and leaves nothing but the question whether, as a matter of law, each fact indispensable to the right of action has been supported by some evidence ? 'If it has, no matter how slight it may have been, the motion must be denied; because it is the right of the party to have the weight and suf.ficiency of his evidence passed upon by the jury — a right of which he can not be deprived, and involving an exercise of power for which, without his consent, the court is incompetent. But where he has given no evidence to establish a fact, without which the law • does not permit a recovery, he has nothing to submit to the jury; and the determination of the court, that the fact constitutes an essential element in the right of action, necessarily ends the case.
It follows, from the views we have expressed, that we do not concur in the position assumed in argument, and supported by several .Now York cases, that a nonsuit may be ordered where the clear weight of the testimony is against the plaintiff. It is said, with ■much plausibilty, that if the weight of the evidence is so decided, .as that the court would grant a new trial if the verdict should be for the plaintiff, he can not he injured by taking the case from the jury in the first instance, instead of waiting to set aside their finding, after they have improperly given him a verdict. But, aside ■from the fact that such a practice involves an assumption of power •by the court which the constitution and laws have committed to the jury, in the very case supposed, the ^plaintiff would have good cause to complain of injury. A nonsuit puts him out of court, and charges him with the costs ; a new trial leaves him in court, and, ordinarily, exacts the costs from the other side. It would also have deprived the plaintiff of the benefit of section 98 •of the practice act of 1831, limiting the power of the court, in granting new trials, to not more than two to the same party.
In fact, the two proceedings have nothing in common. The one reviews the evidence, but uot until the functions of the jury have been discharged, and then only for the purpose of determining whether the cause should be submitted to another jury. The other tabes the evidence from the jury, prevents a verdict, and disposes •of the case. This can only be done when, assuming everything that the party has attempted to prove as true, and thereby obvi *648 ating the necessity for a jury to find it so, the law still disposes of the case against the plaintiff, because some fact, material to his right of action, is unsupported by any evidence. So long as there is evidence tending to prove the whole issue, there can be no substitution of the court, for the jury, to pass upon it; and the party can not be deprived of the right to demand a verdict, without a substantial denial of the right of a jury trial. 22 Pick. 7; 17 Mass. 249; 14 Penn. St. 275.
Our conclusions upon this subject can not be better stated than in the clear and explicit language of one of the learned judges in the court below: “Wherever there is any evidence, however slight, tending to prove the facts essential to make out a ease for' the plaintiff, a nonsuit can not be properly ordered: it is in no-case a question as to the weight, but as to the relevancy .of the testimony. If the testimony tends to prove a prima facie case for the plaintiff, a nonsuit can not be properly ordered. Nor can facts tending to prove a defense on the part of the defendant, though proceeding from witnesses introduced by the plaintiff, be. considered on a motion to nonsuit. If the defendant wishes to set up any such facts, he must resort to the jury to have them established.”
*2. Having settled the principles by which our inquiries are to be guided, we are now prepared to ask the question : Were the plaintiffs properly nonsuited in the present case ? An answer to this question demands a careful attention to the evidence contained in the bill of exceptions, and a settling of the state of facts that it conduced to prove, and then the legal principles applicable to such a state of facts.
There has been, and can be, no dispute that the money, for which this action was brought, was paid by the plaintiffs, and received by the defendants, on a check for $7,500, purporting to be-drawn upon the plaintiffs by Evans & Swift, a firm at Cincinnati engaged in the pork-packing business, and payable to Samuel Taylor & Co., or bearer; and that the check was a forgery, of which the parties were mutually ignorant at the time the payment was made. This check, with another for $7,300, purporting to be drawn by S. Davis & Co., on the Mechanics and Traders’ Bank, and which was also a forgery, was presented in the early part of the day it bears date, by a stranger having the dress and appearance of a drover, and expressing a desire to exchange .them for. *649 Kentucky money or gold, to tbe teller of tbe defendant’s batik, by whom they were taken and the gold advanced, at a discount of one-fourth of one per cent. He testified that he “ did not know the standing of either firm, nor their signatures, but took the checks to Mr. Bishop, the cashier, laid them on his desk, and asked him if he .should make the exchange. He [Bishop] said yes. Can not say whether he examined or knew the signatures. The checks were before him some three or four minutes. He assisted in calculating the premiums. No question was asked as to who the presenter was, •or as to his right to the checks. He was probably in the bank from two to fifteen minutes; should not have recognized him again. He carried off the gold in saddle-bags. Both the banks, upon which the checks were drawn, were within less than a square; there was nothing to create suspicion, and nothing unusual in the transaction.”
*In accordance with a custom of doing business between these banks, and, to some extent, with other banks of the city, this •check, with others drawn upon the plaintiffs and taken by the defendant, were pinned together, with a ticket upon the top showing the amount of each and the aggregate amount of all, and on the .same day presented to the plaintiffs, who paid the amount appearing from the ticket, without any examination of the cheeks; it ■being the custom, however, to examine them on the same day, and return such as were found not to be good. This check was examined, on the same day, by the note-clerk of the plaintiffs, and •charged up against the supposed drawers. The forgery was not discovered until ten days .afterward, when the check was returned to the defendants, and repayment demanded.
For the purpose of showing what was claimed to be gross negligence on the part of the defendants, the plaintiffs introduced sev•eral witnesses engaged, in the business of banking at Cincinnati, who -expressed the opinion that the defendants, in the exercise of proper diligence,.should have required the person presenting the check to have drawn the money himself; or should, by .inquiry, have been satisfied of his right to it, and off -his identity. As expressed by one of them.: “It is the .general custom in this city, when check-is presented for sale — that is, when .it is presented by a stranger to a-bank, not the .one upon which it is drawn — to make inquiries in reference to his right to the check, and the identity of the person.” And with a view-of making it appear that this .negligence *650 •operated directly to their prejudice, and induced the payment of the check, the plaintiffs further gave evidence tending to prove their uniform custom of making such inquiries, when a check of this •character, drawn upon them, was presented by a stranger; and that there was “not generally so strict a scrutiny when checks come from other banks, it being presumed that caution had been already exercised.” The tendency of this evidence can not be mistaken. It clearly conduced to prove the existence of a general custom *among the banks of Cincinnati, requiring the bank taking a check of this character, drawn upon another, from a ■stranger, to be satisfied, by inquiry, of his right to the check, and of the person from whom it was received; and as clearly allowing the bank, upon which it was drawn, to rely upon the presumption that such caution had been exercised, when the check was presented for payment. If this custom, in both its branches, was established to the satisfaction of the jury, the fair presumption •arising would be that the defendants had been negligent in failing to comply with an established custom of the business, necessary not only to their own security, but also to that of the bank upon which the check was drawn, and that the plaintiffs, not being informed to the contrary, paid the check upon the supposition that the custom had been observed; while it would be made absolutely •certain that the intervention of the defendants had prevented the plaintiffs from exercising this precaution ; and nearly so, that if it had been exercised by the defendants, the check would not have been purchased by them, or paid by the plaintiffs.
We do not say that the evidence was sufficient to establish this state of facts, or that it was not. It is enough that.it had that tendency. It is wholly immaterial, for present purposes, how weak and inconclusive it may ,have been, or even that it was contradicted by other evidence given by the plaintiffs. As was well said .in the court below, “if the testimony .be contradictory, it can not all be admitted to be true; if not all true, judgment must be exercised in separating the true from the false; and this is the peculiar province of the jury.”
Assuming all to be satisfactorily proved that this evidence conduced to prove, does the law permit a recovery? Upon this question we have bestowed the careful attention which the importance of the subject, as well as the learning and ability with .which it was treated .in the Superior Court, and by counsel in this .court, *651, 652 seemed to demand, and a majority of the court are brought to the conclusion that it does.
*Thore is, certainly, no room for the application of technical or arbitrary rules, in determining the rights of the parties. Neither the form of the action nor the nature of the subject permits it. The action is brought for money had and received; and it lies in all cases, where one has the money of another, which he can not in equity and good conscience retain. It lies, therefore, for money paid by mistake, or upon a consideration which has failed; because, in such case, the plaintiff did not intend to give his money to the defendant, and the latter can not conscientiously retain money for which he has given no equivalent. This is the general rulo; but it has its exceptions, as well settled and resting upon reasons as solid and satisfactory as the rule itself. Wherever the mistake has arisen from the fault or negligence of the party paying, the money, and can not be corrected without prejudice to the party who has received 5t, there can be no recovery, and simply because the plaintiff is alone In fault; the defendant is under no obligation to submit to loss, to extricate him from difficulty, and may therefore conscientiously retain the money. The question is, does this-case fall within the general rule, or the exception ? We make the solution of this question depend wholly upon the answer to be given to another: Does the negligence imputed to the defendants, subject them to an action for the recovery of the money paid upon the'check? Can a party, upon whom an established course of business devolves the obligation of making certain inquiries, before-taking a check purporting to be drawn upon another, in negligent disregard of that duty, conscientiously retain the money received ■upon a forged instrument, when it appears that such negligence-contributed to induce the payment?
Whatever of doubt might have been once entertained, it has been-long settled that a person giving a security in payment, or procuring it to be discounted, vouches for its genuineness ; and if it proves to be a forgery, he is still liable for the debt, in the one case, or for a return of the money in the other. 2 Johns. 455; 6 Mass. 182 ; 5 Taunt. 488.
*We admit it to be equally well settled, that, where the instrument is drawn upon, or purports to be signed by, the party paying the money, to a holder without fault, and whose situation would be thereby changed to his prejudice if he was compelled to refund,. *653 the money can not be recovered back. The foundations of the rule aré sufficiently obvious. The party is supposed to know his own handwriting, in the one case, or that of his customer or correspondent in the other, much better than the holder can; and the law, therefore, allows the holder to cast upon him the entire responsibility of determining- as to the genuineness of the instrument, and if he fails to discover the forgery, imputes to him negligence, and, as between him and the innocent holder, compels him to suffer the loss. For still stronger reasons, the drawee of a bill or check, who-has accepted it, and again suffered it to go into circulation, is absolutely estopped to deny the genuineness of the drawer’s handwriting. The acceptance necessarily involves the most positive affirmation that the instrument is what it purports to be, and the acceptor is not -permitted to withdraw the assertion, to the prejudice of those1 who have, in consequence of it, given credit to the paper.
In all such cases, either of acceptance or payment, the foundation upon which the drawee is made to suffer the loss, is the imputed negligence in accepting or paying, until he has ascertained the bill to be genuine; and, in case, of payment, notwithstanding he has done it in mistake, and parts with his money without receiving the-supposed equivalent, and notwithstanding the holder has obtained the money without consideration, the former can not be relieved from the consequences of his negligence, at the expense of the latter, and the latter may in equity and good conscience retain what ho has got. But this stern rule is only exerted in favor of a holder without fault, and for a valuable consideration; and we deem it equally clear that he may, by his own negligent conduct, place himself in such an equitable position, in reference to the drawee, as to deprive-himself of the benefit *of this rule, and make it unjust and inequitable that he should keep what he has obtained by mistake, and for which he has given no equivalent.
We do not here speak of negligence as a matter at large. We-only intend to deal with the case before us; and that only requires us to say, that where the negligence reaches beyond the holder, and necessarily affects the drawee, and consists of an omission to exercise some precaution, either by the agreement of the parties or the course of business devolved upon the holder, in relation to the genuineness of the paper, he can not, in negligent disregard of this duty, retain the money received upon a forged instrument. But these propositions, we think, will be found fully sustained, if' *654 not in every particular, by direct adjudications, by the fixed principles upon which nearly all the cases have proceeded.
The leading case is that of Price v. Neal, 3 Burr. 1355. It is not very clearly reported, and has been the subject of some misunderstanding in the subsequent cases. The action was brought to recover the money paid upon two forged bills of exchange, drawn upon the plaintiff; one of which was first accepted and afterward paid, and the other paid upon presentation. Lord Mansfield lays some stress upon this circumstance; and he is very careful to say that the “misfortune happened without the defendant’s fault or neglect,” and that whatever of negligence there was, was on the side of the plaintiff.
Without advancing any views of our own, as the true ground upon which the plaintiff was denied a recovery, it will be sufficient to present those of the Supreme Courts of Massachusetts and New York. In Young v. Adams, 6 Mass. 187, Sewall, J., says, the strong ground for the decision, “ although not so prominently stated by the reporter, was because the plaintiff’s acceptance and payment of these false bills, considering them as drawn upon himself, was Ms own peculiar negligence by which the loss had been incurred; and therefore it was not to be thrown back *upon the innocent holder of the bills.” And Chief Justice Kent, in Markle v. Hatfield, 2 Johns. 462, says:. “ That decision turned upon the negligence imputable to the one party, and not to the other.”
In Smith v. Mercer, 6 Taunt. 80, the payment was made by the bankers of the party, who purported to have accepted the bill payable at their banking-house, and the forgery was not discovered for a week afterward. The court were of the opinion that no distinction was to be taken between a payment by the bankers of the acceptor and the acceptor himself, and gave judgment for the defendant. But the judges were not unanimous: Chambre, J., expressing his dissatisfaction with the reasoning in Price v. Neal, thought the case came within the general rule of money paid by mistake, and could be recovered back; while Gibbs, C. J., being the only judge, as Mr. Chitty thinks, who put the case upon the true ground, rested his judgment wholly upon the delay in giving notice, by which the defendant’s remedy against the indorsers was lost. See Chitty on Bills, ch. 9, p. 463 (8 ed.)
In Wilkinson v. Johnson, 3 B. & C. 435, the bill was paid for the ¡honor of an indorser whose name was forged; but the forgery was *655 -discovered on the same day, and notice being given, the money was recovered back. Lord Tenterden, after examining the previous cases, and stating that a call upon the acceptor for payment was .altogether a matter of course, while a call upon a person to pay for the honor of an indorsor was unusual, and necessarily imports that the name of the correspondent, for whose honor the payment is asked, is actually on the bill, proceeds to say: “ The person thus ■called upon ought certainly to satisfy himself that the name of his correspondent is really on the bill; but still his attention may be reasonably lessened by the assertion that the call makes upon him in fact, though no assertion may be made in words. And the fault, if he pays on a forged signature, is not wholly and entirely his ■own, but begins at least with the ^person who thus calls upon him. And though, where all the negligence is on one side, it may ■perhaps be unfit to inquire into the quantum, yet, where there is any fault in the other party, and that other party can not he said to he ■wholly innocent, he ought not, in our opinion, to profit by the mistake into which he may, by his own prior mistake, have led the other; at least, if the mistake is discovered before any alteration in the situation of any of the other parties — that is, whilst the remedies of all the parties entitled to remedy are left entire, and no ■one is dischaged by laches.” And he adds: “We think the payment, in this case, was a payment by mistake to a person not wholly free from Mame, and who ought not, therefore, to retain the money.”
Now, as it is undeniably clear that a payment supra protest, either for the honor of a drawer or indorser, places the party paying in the same situation as payment by the drawee (the party for whom payment is made being supposed to be his correspondent, with whose handwriting he is acquainted), it is evident that this decision was grounded upon the negligence of the holder, in not ■properly informing himself as to the genuineness of the signature, before presenting the bill to the correspondent of the indorser for ■payment; and the case is very strong to show with what scrupulous .-.fidelity every duty devolved upon the holder must be discharged, to entitle him to retain the money received upon a forgery.
I shall refer to but one other English case — Cocks v. Masterman, 9 B. & C. 902. In that case, as in Smith v. Mercer, the payment was made by the bankers of a supposed acceptor, and the forgery was discovered and notice given the next day. As there were indorsers the paper, the court hold the notice too late.- While *656, 657 it is admitted that the holder had notice in time to have charged the other parties upon the bill, it is nevertheless said, that he had the right, if he saw fit, to take steps against them on the day it matured, and that he ought not to be deprived of this right by the negligence of the party making payment.
*Among the American cases, those of the Gloucester Bank v. The Salem Bank, 17 Mass. 33, and Bank of the United, States v. The Bank of Georgia, 10 Wheat. 333, were payments made upon forged notes, purporting to have been issued by the banks-making payment. In the one case, a delay of fifteen days, and in. the other of nineteen, had occurred in giving notice of the forgery to the banks receiving the money; and in each they were held, entitled to retain it.
There can be no doubt of the correctness of these decisions. In. neither case was the party receiving the money implicated in any fault; and while the decisions are based upon the analogy furnished by the rule, which fixes the rights of the drawee or acceptor of at bill, it is very successfully shown that, in reason, the rule has a-much stronger application to’the redemption of bank-notes, growing out of the fact that they purport to be the party’s own paper,, circulating as money, and therefore difficult to trace back, and from the greater facilities that a bank has to detect forgeries, by the use of registers and private marks.
In the first of these cases, Ch. J. Parker commences his able-opinion by laying down the general principle applicable to that and like cases. He says: “In all such cases, the just and sound principle of decision has been, that if the loss can be traced to the-fault or negligence of either party, it shall be fixed upon him.. Generally, where no fault or negligence is imputable, the loss has-been suffered to remain where the course of business has placed it.” And he very reasonably concludes, that “ it would seem to be a. principle of natural justice, that where a loss has happened, he,, through whose means it happened, should sustain it, although innocent, rather than he who is not only innocent, but wholly without imputation of negligence.’’
In Levy v. The Bank of the United States, 4 Dall. 234, and Bank of St. Albans v. Farmers and Mechanics’ Bank, 10 Vt. 141, the-payment was made upon a check, purporting to be drawn by a depositor upon the plaintiffs. In the first case, *the forgery was detected and notice given on the same day, and in the other., *658 mot until after the expiration of two months; and in both, the right to retain the money was sustained. While the first case is certainly •questionable, the last may have been correctly decided.
The Canal Bank v. The Bank of Albany, 1 Hill, 287, was the case -of a forged indorsement of the payee, and the money paid by the drawees was recovered back; although the forgery was not diseov•ered for two months after the payment, and the remedy against other indorsers was lost. .
We do not cite this case as bearing directly upon the question under discussion, as it is well settled that payment by the drawee does not involve an admission of the genuineness of the signature of any indorser; and the rule has even been carried so far, as to be .applied to the case of a bill payable to the order of the drawer, and purporting to be indorsed by him. Story on Bills, sec. 412. But •the case is valuable for the general rule elicited by the court, upon a full review of all the cases we have cited, that “ money paid by • one party to another through a mutual mistake of facts, in respect ■to which both were equally bound to inquire, may be recovered back;” • and that when money is thus paid upon a forgery, it is sufficient to .-give notice, without unreasonable delay, after the forgery is discovered.
In the case of the Bank of Commerce v. The Union Bank, 3 Comst. 230, the forgery consisted in increasing the amount by altering the body of the bill; and the drawees recovered back the money, although a notice was given too late to enable the holder to charge the indorsers. Judge Ruggles, in delivering the opinion of the •■court, after stating that the rule which casts the loss upon the • drawee, when the drawer’s name is forged, “is founded on the supposed negligence of the drawee in failing, by an examination of the ■signature, when the bill is presented, to detect the forgery and refuse payment,” and that the rule did not apply to an alteration in the body of the bill, which was not ^presumed to be in a handwriting known to him, arrives at the conclusion, that “ the ■greater negligence in a case of this kind is chargeable on the party who received the bill from the perpetrator of the forgery,” and that, “if reasonable diligence is exercised in giving notice after the •forgery comes to light, it is all that any of the parties can require.”
In Goddard v. The Merchants’ Bank, 4 Comst. 147, the signature of the drawer was forged, and the bill was paid the day after it was protested by the plaintiff, for the honor of the drawer. The bill *659 purported to have been drawn by a bank in Ohio, upon the American Exchange Bank in New York, and was indorsed by the person, who forged it to the Bank of Butland, Yermont, by which it was-transmitted to the defendants for collection. In consequence of the absence of the notary, in whose hands it was placed, from his office,, the plaintiff did not see the bill at the time he made the payment, but left word to have it sent to his place of business. On seeing it the next day, he pronounced it a forgery and demanded back the money. The court held him entitled to recover. They admit that he occupied the same position as the drawee would; but as he paid the bill without an opportunity of judging whether it was signed by his correspondents or not, and upon the representation of the holders that they had such a bill, that he could not be held to have admitted the genuineness of the signature. And although the' forgery was discovered too late to give notice of protest, they held that no such notice was necessary, as the defendants had the bill only for collection and needed no recourse, and the payee who' forged it was liable to the'owners without notice.
We have thus particularly referred to every important case, in England and the United States, having a direct reference to the subject under examination, and to the grounds upon which these decisions have been made. It is readily admitted that no one of them is, in all respects, like the present. The governing principles by which these cases wore ruled, rather than precise identity *of circumstances, must furnish a guide for us. Several questions will readily suggest themselves, which we do not consider necessarily involved in the decision of this case. Amongst these is the question, whether, in cases properly within the rule, of payment by the drawee of a bill or other party occupying a like position, the payment becomes absolute as soon as made; or whether a discovery of the forgery, and notice given in time to charge the real parties ■ upon it, will entitle him to a return of the money ?
The cases cited from the Massachusetts and Wheaton’s Beports pretty strongly imply that, in the case of bank-notes, the payment is absolute; and Mr. Justice Story, in his Treatise on Bills, is evidently of the opinion that the same rule is applicable to the payment of bills and cheeks. For myself, I must be permitted to ■ say that I can see very little foundation in principle for this opinion. The ground upon which the drawee is denied the right to.correct the mistake originating in his own negligence, is the preju *660 dice arising to the holder from making payment instead of suffering the paper to be protested. I do not say that this prejudice must be affirmatively proved; the law may, in many cases, presume it. But where the only prejudice which the party could sustain would be the loss of remedies against other parties, and when tho law by its own fixed rules determines that those remedies remain unimpaired, I think no such presumption can arise. And such is not only the opinion of Mr. Chitty, but he thinks it the fair result of the modern English cases. After alluding to the grounds of the contrary opinion, he says : “ But, on the other hand, it may be observed, that the holder who obtained payment, can not be considered as having altogether shown sufficient circumspection ; he might, before he discounted or received the instrument in payment, have made more inquiries as to the signatures and genuineness of the instrument, even of the drawer or indorsers themselves; and if he thought fit to rely on tho 'bare representation of the party from whom he took it, there is no reason that he should profit by the accidental payment, when the *Ioss had already attached upon himself, and why he should be allowed to retain the money, when, by an immediate notice of the forgery, he is enabled to proceed against all other parties precisely the same as if the payment had not been made; and consequently the payment to him has not in the least altered his situation, or occasioned any delay or prejudice. It seems that, of late, upon questions of this nature, these latter considerations have influenced the court in determining whether or not the money shall-be recoverable back.” To this may be added the repeatedly expressed opinion of the courts of Now York.
We pass without any remark, or the expression of any opinion, the claim of the plaintiffs, that, as the defendants were confessedly liable, under the custom, to return the money for one day, as there were no parties upon the paper to be made liable by notice of non-payment, and as the money was irrecoverably gone before tho check was presented, unless recovered from the forger, whose liability still continues, the failure to give notice until the forgery was discovered, did not, in presumption of law, prej udice the defendants, and that it could only operate against the plaintiffs when it was shown that actual loss ensued; and, for the purposes of the case, we yield to the defendants the position, that, after the expiration of that day, and after the plaintiffs had the opportunity *661 to examine the signature, they stood upon the same ground as though they had paid on sight of the check. We do not examine these propositions, because we think the case now depends upon much more obvious considerations.
Recurring again to the fact, that the plaintiffs gave evidence tending to establish a course of business, which required the defendants to take the first precautionary step for the detection of the forgery, which they wholly omitted to do, we proceed to apply the principles deducible from the cases referred to, to that attitude of the controversy. Yiewed in that light, the case is most clearly within the principle upon which Wilkinson v. Johnson was decided. In that case, in consequence of the relation *of the parties, it became the duty of the holder to exercise active diligence to ascertain the genuineness of the bill. In this case, a like obligation arose from the course of business between the parties. In this case, as in that, the attention of the plaintiffs might be “reasonably lessened,” under the supposition that this obligation had been regarded. .And while it is true, here as there, that the plaintiffs ought to have satisfied themselves of the genuineness of the cheek before making payment, yet the fault “ was not wholly and entirely their own, but began, at least,” with the defendants ; and the payment was made, not only “ to a person not wholly free from blame,” but to one grievously in fault.
Quite as clearly is it within the rule of Chief Justice Parker, requiring the loss to fall upon the party to whose “ fault or negligence ” it can be traced, and that of the Supreme Court of Now York, affirming the general proposition that where the parties are equally innocent, or equally in fault, and money is paid upon a mutual mistake of facts, “ in respect to which both were equally bound to inquire,” it may be recovered back. In this case, there is every reason to believe, that if the defendants had required the person presenting the check to show who he was, he would have declined the ordeal, and it would not have been bought or paid. The loss may therefore be traced directly to their negligence. But whether this would have prevented the fraud or not, it is enough that both parties were bound to inquire, and, allowing both to be in fault, the result is precisely the same. The case of Goddard v. The Merchants’ Bank is full to the purpose, that, in order to bring the drawee within the exception to the rule, which allows money paid under a mistake of facts to be recovered back, the whole responsi *662, 663 bility of investigating must be east upon him by tbe holder, and, as between them, be must be left in possession of every effective means for prosecuting tbe inquiry. If tbe bolder does not see fit to require this, or takes any part of tbe duty upon himself, or deprives the drawee of any part of these *means of information, tbe case, in tbe language of Chief Justice Bronson, “is out of tbe exception, and witbin tbe general rule.” And in all cases witbin tbe general rule, all tbe New York cases affirm it is sufficient to give notice when the forgery is discovered.
To entitle the bolder to retain money obtained by mistake upon a forged instrument, be must occupy tbe vantage ground, by puting tbe drawee alone in tbe wrong; and be must be able truthfully to assort that be put tbe whole responsibility upon tbe drawee, and relied upon him to decide, and that tbe mistake arising from his negligence can not now be corrected without placing tbe bolder in a worse position than though payment bad been refused. If tbe bolder can not say this, and especially if tbe failure to detect tbe forgery, and consequent loss, can be traced to bis own disregard of duty, in negligently omitting to exercise some precaution which he bad undertaken to perform, be fails to establish a superior equity to the money, and can not with a good conscience retain it. To allow him to do so, would be to permit him to take advantage of bis own wrong, and to pervert a rule, designed for bis protection against tbe negligence of tbe drawee, into one for doing injustice to him.
Nor is it anything remarkable or unusual that such an obligation should arise from a settled course of business between tbe parties, or be ■established by tbe proof of a custom; or that tbe bolder, should, for bis negligent failure to regard it, be deprived of rights which be would -otherwise be entitled to demand. No court has been more reluctant than this to allow local customs to interfere with the general principles of law; but to a certain extent, and witbin certain limits, it be■comes absolutely necessary to enforce them, or to disregard tbe implied conditions and understandings upon which parties have dealt. To allow them to operate against third persons, who can not be shown to have bad any knowledge of their existence, is one thing; and to hold tbe immediate parties to the controversy bound by a •course of business upon which they have uniformly acted, or one ■embarked in *a particular business, at a place where it has been found necessary to its safe or convenient prosecution, that a *664 general custom should be observed, under obligations to conform to' it, is quite another. Every one engaged in a business, undertakes to bring to it a competent knowledge of its rules and principles; and those who deal with him, have a right to rely upon his having regarded them.
The custom which the plaintiff sought to establish, seems to have been one of the most reasonable character. It is a great error to’ suppose that the drawee of a bill or check is bound to rely alone upon his knowledge of the handwriting of his customer or correspondent. The testimony in the case, as well as every day’s experience, shows this alone to be an insufficient security, when dealing with strangers and in large amounts, against the ingenuity with which forgeries are now committed. The next most effective precaution is that of requiring the holder to furnish some reliable information of himself, and of his right to the paper. But when another bank intervenes and takes the check, this can not be resorted to by the drawee. As between the banks, therefore, the observance of the custom becomes a matter of mutual protection, and saves to the drawee the benefit of this precaution. While the bank taking the check, by its exercise, is consulting its own security, as well as that of the bank upon which it purports to be drawn, it gets a full remuneration for its care, in the reciprocity afforded in relation to checks drawn upon itself and taken in like manner.
When the defendants purchased this check, they knew full well that it deprived the plaintiffs of the ability to make this part of the investigation, and that it would be paid to them without any examination whatever; and if the custom really exists, they must have known equally well that, in afterward passing upon the genuineness of the paper, the plaintiffs would have a right to rely, as an important element in forming a conclusion, upon the supposition that the defendants had made the investigation, and were ^satisfied with the result. And, while it may be very true that they did not warrant the genuineness of the checks, in the package which they presented for payment, yet, in the event siipposed, they did what, was 'equivalent to affirming — that they had checks for the amount they asked, received from persons either known to them, or of whose identity and honesty they were satisfactorily informed.
But the short answer to all this made by counsel for the defendants, and adopted in the Superior Court, is that negligence alone, however gross, and however injurious to the plaintiffs, can not affect *665 the defendants; that “unless they have been proved to be complicated with the fraud by which the plaintiffs have suffered, they can not be held to refund the amount that has been paid to them.” And they very correctly say that there was no proof of any such fraud or complicity in the forgery. This position is grounded upon the authority of several recent English decisions in relation to the' proof necessary to "impeach the title of a holder of negotiable paper, in conflict with many earlier cases in that country.
Gill v. Cubitt, 3 B. & C. 466, was the case of an accepted bill, which had been stolen, and was afterward discounted by the plaintiff (a bill-broker), without knowing the name of the holder, though his features seemed familiar, and without asking any questions as to his right to the bill. C. J. Abbott left to the jury the question, “ whether the plaintiff took the bill under circumstances which ought to have excited the suspicion of a prudent and careful man ? ” And he put to them this very significant inquiry, what they would think of a sign like this : “ Bills discounted for persons whose features are familiar, and no questions ashed.” The defendant had a verdict, and the court refused to disturb it. This decision was followed in several subsequent cases, until at length, in Crook v. Jadis, 5 B. & Ad. 911, which was also the case of an accepted bill, fraudulently put in circulation, Lord Denman told the jury to find for the ^plaintiff, “ if they thought he had not been guilty of gross negligence in taking the bill; ” and his ruling was sustained by the whole court. This case, again, governed several others, until, in Goodman v. Harvey, 4 Ad. & Ell. 870, Lord Denman .and his associates took another step, and held that “gross negligence only could not be a sufficient answer, where the party has given consideration for the bill. Gross negligence may be evidence of mala fldes, but is-not the same thing,” And they add, “ We have shaken off the last-remnant of the contrary doctrine.”
It is not a little remarkable, if these cases can properly have so-commanding an influence upon the question before ns, that they' should not have been alluded to, either by the court or counsel, in any of the cases to which we have referred. They present an important question, and, when it shall properly arise, one which will deserve careful attention ; but, in the decision of this case, we regard it alike immaterial, whether the rule of Lord Tentorden, or the first impression, or “ sober second thought ” of Lord Denman,, is adopted. They were all actions brought upon genuine bills,, either lost, or fraudulently negotiated; and the rule which; *666 governed them all, has its foundation in that public policy which' fosters the circulation of bills, as a medium of exchange, answering the purposes of currency. But the law has shown no such anxiety to facilitate the circulation of forgeries. On the contrary, however innocent and careful the holder may have been, if he is obliged to trace his title through a forgery, the instrument is a nullity in his hands. Before any encomiums can properly be passed upon the peculiar and happy adaptation of the bill of exchange for circulation, or any foundation can be laid for insisting that the title of the holder shall not be affected by anything that may have attended its private history before reaching his hands, a bill must exist, of which title may be predicated, and to which such considerations may be referred. We do not say that every name appearing upon it must be genuine; but there must at least, either at its inception, *or coming upon it afterward and impliedly warranting the previous signatures, be some one liable to pay it before it acquires the character of a bill, in any respect or for any purpose. The rule insisted upon, is a rule alone applicable to the protection of legal titles, and to the instruments by which such titles may be acquired, .and to no other. What title did the defendants get when they took the paper appearing in this case ? Certainly none. It was as perfect a nullity as though no word had been written upon it. No one .appeared to be liable upon it but the drawers, and their names were forged. Even the felon, although liable for his fraud, was not liable as a party to the paper. With exactly the same propriety could a plea of purchase, for a valuable consideration without notice, be .sustained upon a forged deed, as this rule applied to a paper of that -description.
If the defendants are entitled to retain the money, it is upon a different principle, resting upon different considerations, and with other and different objects. Confessing the nullity of the paper as ■a muniment of title, they must stand upon their interest, to know it at the earliest moment, and their right to exact the information from the plaintiffs, when it was presented for payment. The negligent omission of the plaintiffs to discharge this duty, resulting in injury to the defendants, lies at the very foundation of the rule, which subjects them to the loss and allows the defendants to retain the money. But it would indeed be singular, if the one party could be visited with consequences so severe, upon the mere legal imputation of negligence and -injury, and the other stand wholly unaf *667, 668 fected for their negligence, however gross and injurious it might, have been; As was said in the Bank of Commerce v. The Union Bank, “ the plaintiffs’ right of recovery rests on equitable grounds and, in our opinion, they place themselves upon the highest equitable ground for a return of the money, when they show it was theirs, that they parted with it by mistake and without consideration, upon a forged instrument which the defendants, by their negligent disregard of duty, *had contributed to induce them to act upon as genuine. In the forum of conscience, it is true, there may be a wide difference between intentional injuries and those arising from negligence. But no man operates quite as absolutely in this world as though he was the only man in it; and the very existence of society depends upon compelling every one to pay a proper regard to the rights and interests of others. The law, therefore, proeeedingupon the soundest principles of morality and public policy j has adapted a large number.of its rules and remedies to the enforcement of this duty. In almost every department of active life, rights are in this manner daily lost and acquired, and we know of no reason for making the commercial classes an exception.
The necessity for care and caution on the part of those who use bills and checks, to prevent injury to those upon whom they are drawn, is strikingly illustrated in another class of cases, which turned upon a principle very analogous to the one that we have applied to this. As a general proposition, it is perfectly well settled that payment upon a forged check or order can not be charged by the party paying, against the party purporting to have drawn the* paper; but the latter will be entitled to recover the money intrusted to the former, however innocently or with whatever caution the payment may have been made. Hall v. Fuller, 5 B. & C. 750; Johnson v. Windle, 3 Bing. N. C. 225; Roberts v. Tucker, 12 Q. B. 560.
But yet, in Young v. Grote, 4 Bing. 253, where the customer had intrusted his wife to fill up checks in his absence, and this had been' so inartificially and carelessly done, as to be easily changed from £50 to £350, the banker was held entitled to a credit for the larger sum. In the very recent case of Orr v. The Union Bank of Scotland, in the House of Lords (29 Eng. Law & Eq. 1), Lord Chancellor Cranworth, in speaking of the general rule, and of the exception, ingrafted upon it by this case, says: “ The decision went on the ground that it was the fault of the customer; the bank had been deceived. The ^principle is a sound one, that when the cus *669 tomer’s neglect of due caution has caused his bankers to make a •payment on a forged order, he shall not set up against them the invalidity of a document which he has induced them to act on as genuine.”
We have thus, at much greater length than was intended at the •outset, stated our views of this case. We have nowhere doubted the wisdom or policy of the rule, which allows an innocent holder to require the drawee to pass upon the signature of the drawer, and makes him responsible for the decision he makes ; nor the justice of permitting the former to retain the money received upon a forgery, when some one must suffer by the mistake. But we must be better informed than at present, before we shall be able to perceive the justice or propriety of permitting a holder to profit by a mistake which his own negligent disregard of duty has contributed to induce the drawee to commit.
Should the plaintiffs be ultimately able to satisfy a jury of the .-state of facts which their evidence before conduced to prove, they would, in our opinion, have established a clear right to recover.

Judgment reversed and cause remanded.

Thurman, C. J., and Swan, J., dissented.